No. 22,103.

ANTON SCHUMACHER et al., Partners, etc., et al., *Appellants*,
v. ANTON JACOBS, *Appellee*.

#### SYLLABUS BY THE COURT.

1. BUILDING CONTRACT — *Alleged Oral Agreement to Protect Adjacent Stone Wall Not Proven.* The record examined, and held sufficient to sustain a judgment for defendant in an action against a contractor for an alleged breach of an oral contract to protect the stone wall of a building adjacent to the place where the contractor was engaged in excavation and foundation work for a new building.

2. SAME—*Instructions.* The instructions to the jury examined, and when read and construed together are held to fairly state the issues and the pertinent law, and to be free from material error.

Appeal from Ellis district court; JACOB C. RUPPENTHAL, judge. Opinion filed July 10, 1920. Affirmed.

*Lee Monroe, James A. McClure, C. M. Monroe*, all of Topeka, *C. W. Burch, B. I. Litowich,* and *La Rue Royce,* all of Salina, for the appellants.

*E. A. Rea,* and *E. C. Flood,* both of Hays, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action against a contractor for damages occasioned by a falling wall which, it was alleged, the contractor had agreed to protect. The defendant had been awarded a contract to erect a new building next to the wall in

Schumacher v. Jacobs.

question; and plaintiffs alleged that one of the conditions under which he was awarded the contract was an independent oral agreement that he should protect and save the wall. The defendant denied the making of this agreement. In the contract for the new building the only reference to the wall provided:

"If old stone wall on south requires underpinning when basement [of new building] is dug, this will be an extra paid by owners, time and material."

The plaintiffs' testimony was amply sufficient to support their claim that defendant had agreed to protect and save the wall. They testified that prior to and about the time of the letting of the contract for the new building they had repeatedly mentioned the matter to defendant and had explained to him that he, or whoever should get the job for the new building, would have to protect and save the old stone wall of their adjacent building, and that defendant agreed to that, and assured them that he could and would protect and save the wall.

On the other hand, defendant testified that he had never made any such agreement; that this matter never was the subject of negotiations between them; but that the architect who drew the plans for the new building brought up the subject of the old wall on the day the contract was awarded; and that at that time no one knew the character or depth of the foundation of the old wall, and so it was then agreed that if the old stone wall had to be underpinned, that such item, for work and material, would be an extra.

The stone wall which fell was two stories in height. It formed the north wall of a building otherwise made of lumber. This building faced the west. Its ground floor had been occupied theretofore as a restaurant, and its second story as a residence. Next to it, on the north, there had been two old mercantile buildings which plaintiffs removed to make space for their new building. The merchandise from these removed buildings was stored in the building on the south, and much of it, weighing several thousand pounds, was stored on the second floor. The joists of this building, upstairs and down, were 2 x 8's, laid twenty-four inches on centers, having an unsupported span of twenty-two feet. Near the stone wall, on the north, was a basement which had pertained to one of the build-

ings which had been removed to make room for the new structure. This basement was walled, and it served as a retaining wall for the foundation of the wall which collapsed, but this basement did not extend the entire length of the stone wall in controversy. It was shown that the stone wall was weak and shaky in times of high winds, and especially so since the removal of the old buildings to the north of it. A day or two before the wall fell, it was seen to be "puffing out about the middle east and west and about the middle up and down." The eaves trough of the old building next to the wall, which had been removed, was clogged and defective, and rain water from that building had disintegrated the lime in the stone wall and had rendered sodden its foundation. The wall fell on March 29. The weather was ordinarily freezing at that season, and it was usually about the middle of the afternoon ere it thawed—just about which time the wall collapsed. It was also shown that after some of the excavation work was done, the defendant talked with one of the plaintiffs about his proposed method of underpinning the wall, and the latter approved of that method. Accordingly, defendant, who had left a bank of earth two or three feet wide at the top and five or six feet wide at the base, next to the stone wall, set laborers at work digging two holes in the bank, at the east end of the stone wall, beyond where the old basement extended, the purpose being to build stone and cement pillars to uphold that part of the wall. While the workmen were so engaged the wall bulged out in its center at a considerable distance from where the workmen were digging, and then the whole mass collapsed, carrying down the whole structure, precipitating the merchandise into the old basement, and also damaging the next building to the south, which was partially attached to the fallen building.

We have set out the foregoing to develop the main features of the evidence—to show plaintiffs' contention that defendant had agreed to protect and save the wall; and defendant's contention that he did not so agree, but that the wall fell from its own weakness and its overloading with merchandise, and that what defendant was doing at the time and what he had theretofore done had nothing to do with the collapse of the wall.

The general verdict and certain special findings of the jury were in defendant's favor:

"1. Did the plaintiffs and the defendant Anton Jacobs prior to the letting of the written building contract or before the falling of the building in question enter into a verbal contract by the terms of which Anton Jacobs agreed to protect the wall of the stone building' on the south, to underpin the same, and to use such means by underpinning or otherwise as were necessary to keep said stone wall from falling into the excavation or cellar on the north? Answer: No.

. .  .  .  .  . .  .  .  .  .  .  .  . .  .

"14. How much do you allow the defendant for work and material under his contract? Answer: $784.51."

Judgment was rendered accordingly, and plaintiffs appeal.

Plaintiffs first complain of the enlargement of the issues, but we do not discern that they went beyond the rather extensive recitals of facts set up in the pleadings.

A model of the stone building was introduced, over plaintiffs' objection, to show that the building had collapsed by reason of its inherent weakness and its overloading with merchandise, which would tend to bend and spring the joists and push the wall outward. This was competent for what it was worth to prove that the wall fell from obvious causes with which defendant's alleged negligence had nothing to do. While it is true that plaintiffs' theory of a right to recover was eventually narrowed to the question of a specific oral contract to protect and save the wall, the issue was not originally so clearly defined in the trial below. Plaintiffs had alleged:

"The defendant carelessly and negligently and wantonly proceeded with said excavation nearly to the base of said stone wall without employing any means or methods for the protection thereof; and on account of such excavation, and by so carelessly, negligently and wantonly digging and removing the earth near to the base of said stone wall and to the depth of about eight feet, without employing any means or methods to prevent the giving away of said stone wall, or the dirt thereunder, upon March 29, 1917, the defendant caused said stone wall and the dirt thereunder to give way and fall into said excavation and caused said two-story building to collapse and fall into said excavation, whereby the same was totally destroyed."

Considerable objection is made to the trial court's instructions, but when these are read and construed together they are free from serious fault. They elaborated on the theory of plaintiffs' right to recover if defendant did agree to protect and save the stone wall, and even went so far (in plaintiffs' favor) as to declare that, if he did so agree, only the act of God, inevitable accident, and the like, would excuse him. The in-

structions said that such a contract as plaintiffs insisted on could be made by a series of oral conversations, and if the nature of the contract could be gleaned with sufficient precision from the several different conversations had at different times and places, it would be binding. "There must, however," said the court, "be a fairly, reasonably definite proposition, offer, or condition or combination of these on one side of things to be done and performed under an oral contract, and a fairly, reasonably definite acceptance by the other party by words or acts or acquiescence, or all of these."

It is difficult to find anything that looks like a plain palpable error in this case. The plaintiffs' argument is mainly based upon the assumption that it can still be considered that there was a contract to protect and save the stone wall. But the jury has said that there was no such contract, and after a laborious study of this record, the court has no misgiving about the correctness of that finding. What the record does show is strong corroborative proof that the clause inserted in the written building contract relating to the underpinning as a possible necessity and consequent extra item to be paid for by plaintiffs, was all the contract ever entered into by the parties concerning this wall. The parties did not know, even the architect did not know, whether the stone wall would need to be underpinned. Its foundation structure was unknown by any of the parties concerned. Defendant did not know of the inherent weakness of the wall. He did not know of the overloading. No negligence was shown in the way he set about the work of underpinning, and the wall did not collapse at the place the underpinning was attempted until it gave way in the middle where no work of any sort had been done. Some of these facts were in dispute, of course, but the evidence for the defendant —which the jury obviously believed—was to that effect.

There was a controversy in the trial court over the failure to notify the defendant of a default of his, under his written contract. That feature of the case only involved his right to recover for loss of profits when his contract was canceled. But as no allowance was made to him on that account, that matter needs no present attention.

There is nothing further in this case to justify discussion. A reply brief for plaintiffs attempts a somewhat different

·theory from that pressed in the original brief. In the latter brief it is said:

"The plaintiffs, at all times, sought to recover upon an oral contract for the underpinning of the wall."

In their first brief they say:

"The plaintiffs instituted this action against the defendant for damages, alleging the breach of his contract, verbally made, to protect the stone wall in case he was awarded the building contract."

But the record fails to establish a right of redress on either theory; and as nothing approaching error in this case can be discerned, the judgment is affirmed.

BURCH, J., not sitting.